IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SONIA PEREZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 09 C 2095 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| BOARD OF EDUCATION OF | ) |
| THE CITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Sonia Perez filed suit against the Board of Education of the City of Chicago ("Board") alleging race and national origin discrimination in violation of 42 U.S.C. § 1981 and a violation of the Illinois Whistleblower Act ("Whistleblower Act"), 740 Ill. Comp. Stat. 174/20. Before the court is the Board's motion for summary judgment on both counts. For the following reasons, the Board's motion [#39] is granted.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id*. While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id*. at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND

### I. Perez's Performance as Case Manager/Counselor

Perez began her employment with the Chicago Public Schools ("CPS") in 1994. In 1998, she was assigned to Gary Elementary School ("Gary School") as a special education teacher and, in 1999, became a bilingual classroom teacher. In 2001, the principal at Gary School asked Perez to become a Case Manager/Counselor, for which she received an additional stipend. As Case Manager/Counselor, Perez was responsible for all special education matters, including ensuring that Gary School remained in compliance with Individual Education Plan ("IEP") requirements, defined by the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.*, and preparing and completing IEPs for all students with disabilities. IEPs must be uniquely tailored to each student according to his or her special education needs.

On July 23, 2007, Alberto Juarez became principal at Gary School and took over responsibility for overseeing the special education program there. Perez was then in her seventh year as Case Manager/Counselor. During the summer Juarez became principal, he and Catherine Polenisiak, who taught gifted math at Gary School and also held a special education certification, reviewed Perez's IEPs and found numerous errors. Juarez and Polenisiak had "several" conversations about these IEP irregularities that summer. Def. Board of Education's Rule

56.1(a)(3) Stmt. Of Undisputed Material Facts ¶ 17, hereinafter "DSF ¶ ___." Most of Perez's IEPs for the upcoming year appeared to be carbon copies of one another with different dates attached, some were missing parent signatures and/or dates, and the meeting minutes were incorrect. Perez apparently instructed school staff not to date certain IEP documents and signed her own name on the same IEPs in different capacities, including Case Manager/Counselor, District Representative, Special Education Teacher, Regular Education Teacher, Evaluation Representative, Bilingual Specialist, and Interpreter/Translator. Polenisiak testified that these identified IEP issues required Juarez and another Gary School staff member to spend over a week contacting parents to inform them of their child's IEP content and obtain required signatures and approvals.

On April 4, 2008, Juarez received written notice from CPS's Office of Specialized Services ("OSS") that Gary School was out of compliance with its IEPs. Juarez informed Perez and asked her to respond by providing him with tracking reports, three-year evaluations, IEPs, and her schedule for April and May. Perez, however, did not submit these materials to Juarez by the requested time, despite admitting that she was aware of "concerns with compliance" that same month. Pl.'s Ex. A 16:1–6, hereinafter "Pl.'s Dep." Additionally, Juarez received other complaints about IEPs under Perez around December 2007, including that teachers and parents were not invited to IEP meetings and had been instructed to sign IEP documents without being given appropriate explanations. In May 2008, Perez still had many IEPs that remained out of compliance since annual review meetings with parents and service providers that were supposed to be completed between October 2007 and April 2008 still had not occurred. To remedy this,

3

Perez held around eighty IEP meetings in May 2008, when a typical month consisted of between twenty and twenty-five.

Perez had other performance problems as Case Manager/Counselor as well. First, Perez had interpersonal communication problems with co-workers at Gary School. For example, Juarez appointed two colleagues to assist Perez with completing her work, but there was a "fall out" and Perez had "issues" with both of them as of May 2008. DSF ¶ 29. Yvette Collins-Story, Director of CPS's Citywide Services Office, also testified that she received complaints from Gary School's former principal about Perez's inability to get along with clinicians responsible for student IEP assessments.

Perez also had issues with time management. Perez felt that she had insufficient time to perform her duties and testified that "a lot" of them were not completed as a result. DSF ¶ 33. From August 2007 through May 2008, however, Perez worked past 4:00 p.m. on only three days, although she claims she took work home with her. Further, Perez clocked out before 3:40 p.m. on all but one day in March 2008 because she left work early to carpool with her husband. Juarez testified that Perez was "not the type of person who would go above and beyond" to work later than the regular school day. DSF ¶ 41. Juarez also testified that Perez's eventual replacement, Johanna Jacobson, worked longer days as Case Manager/Counselor and was able to complete the duties assigned.

Additionally, Perez ran into difficulties managing the Illinois Standards Achievement Test ("ISAT"). Perez was in charge of the overall ISAT process as Case Manager/Counselor, and teachers administered the tests to students over the course of four days. Perez's responsibilities included preparing student lists for classrooms, reviewing student eligibility, and

taking inventory and organizing ISAT materials sent to Gary School, such as test booklets and supplies. On March 9, 2008, Perez claimed that she was dedicating 100% of her time to ISAT testing, but admits that she had problems fulfilling her testing responsibilities. For example, Perez left the testing area at 1:40 p.m. on one testing day without approval and without completing ISAT materials, which resulted in the school's having to delay testing for third and fifth graders. Perez also arranged and attended a different meeting on the same day the school was scheduled for testing. Jacobson testified that ISAT administration ran more smoothly when she took over for Perez.

## II.     Perez's Communications Prior to Reassignment

On March 3, 2008, Perez sent an email to Barry Pederson of the Illinois State Board of Education ("ISBE") with the subject "ELL Modifications," asking him to clarify an apparent conflict between ISBE and CPS policies. Her email stated:

> Per our conversation, we need clarification from the state as to the ELL modifications. The ISBE administrators manual states: Students who are classified as [Limited English Proficiency], but do not have an IEP or Section 504 Plan, may receive test accommodations. . . . The Chicago Public Schools Office of Language and Culture and the Area 10 Office are stating that all bilingual students "(regardless of a Bilingual classroom or not)" be provided with these modifications. Teachers feel that the students who have been in a monolingual classroom who will be removed from their normal environment . . . would be placed at a disadvantage. There are also some students who show up as Program Year 0-5 because they transfer in from another district. In these cases we should go by the physical student record and not what the IMPACT system displays. Please clarify this issue for us. Thanks. Sonia L. Perez.

Pl.'s Ex. 7. Perez notified Juarez of her email to Pederson the next day on March 4, 2008.

Additionally, on March 9, 2008, Perez sent an email to Collins-Story with the subject "I need your help," explaining that she did not have time to complete her other job responsibilities during ISAT testing. It stated:

5

> Y. Collins-Story, I am requesting your assistance so that I can avoid sending initial and annual cases to summer assessment. I am presently not provided with enough time for case management duties. Please look at the tracking form below. Please also look at our annuals due on IMPACT. I would appreciate your assistance in speaking with our new principal, Mr. Juarez. He is a wonderful person and is trying his best to run the school. However, if you could please inform him about our legal obligations to complete these cases I would really appreciate it. Please provide him with further information about these items.
>
> 1. All referrals must be responded within 10 days.
> 2. Placement for students who were found eligible for special education services must be provided within 10 days.
> 3. All meetings for 8th grade students must be completed ASAP.
> 4. Schools are still responsible for providing IEP services even though ISAT testing is occurring.
>
> Presently, my schedule is dedicated 100% to ISAT testing. I can only work on case management during my 20 minute lunch. I would really appreciate you talking to Mr. Juarez so that he can make informed decisions. Thanks.
>
> Mr. Juarez, My intentions are to avoid getting in trouble with the cluster office later in the school year. There will only be 11 Mondays (team days) when we return from spring break. I must plan all meetings ASAP.

Pl.'s Ex. 2.

### III. Perez's Evaluation and Reassignment to Special Education Teacher

In December 2007, Juarez counseled Perez about her job duties, time management, and communication. He called at least two meetings to specifically discuss Perez's communication problems and to settle disputes between Perez and support staff. Juarez then formally evaluated Perez's performance during IEP meetings on May 13, 2008 and May 16, 2008. At the May 13, 2008 meeting, Juarez observed that the meeting was not well organized and that parents and staff did not seem to know what was going on. For both meetings, he rated Perez's performance "satisfactory," which captured "a moment in time." DSF ¶ 22–23. The parties dispute the specifics of Perez's evaluation sheet. The Board contends that Juarez rated Perez with some

weaknesses and low strengths, since he checked the line for "strength" toward the weak side instead of the strong side. DSF ¶ 23. Perez, however, argues that there is no such thing as a "low strength" and that these checks on the far right edge of the strength column should be treated as strengths and nothing more. *Id.*

On May 30, 2008, Perez learned that she had been removed from her Case Manager/Counselor position and reassigned to special education teacher for the next school year. The parties dispute Juarez's basis for reassigning Perez. Perez contends that Juarez, who is Mexican, reassigned her because she is Mexican and fluent in Spanish, while the Board maintains that Perez's performance deficiencies as Case Manager/Counselor prompted the switch. The only other potential candidates for special education teacher were Friedrich Petri, a computer teacher, and Polenisiak, a gifted math teacher, who were both Caucasian and held special education certifications like Perez. Petri and Polenisiak, however, did not display deficiencies in their respective positions. Although all three employees indicated on their April/May 2008 teacher preference assignments that they wished to remain in non-special education positions, only Petri and Polenisiak's preferences were granted while Perez's was not. Assigning Petri to special education teacher, however, would have created a "predicament" of finding another computer teacher. DSF ¶ 60. Further, Perez had exposure to all of the teaching approaches utilized in special education classes at Gary School and spoke fluent Spanish and English, which Juarez considered helpful for teachers.[1]

## DISCUSSION

---

[1] Of the 1300 students at Gary School, about 99% are Hispanic and about 80% of parents need a translator.

## I. Race and National Origin Discrimination

To establish a prima facie case of race or national origin discrimination under 42 U.S.C. § 1981,[2] Perez must satisfy the same elements required for a discrimination claim under Title VII. *Egonmwan* v. *Cook County Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010). Since Perez has no direct evidence that Juarez reassigned her to the special education teacher position because she is Mexican, she must proceed under the indirect burden-shifting method. *Id*. at 849–50. Under this method, Perez must show that (1) she is a member of a protected class, (2) her job performance met the Board's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated individuals who were not in her protected class were treated more favorably. *Id*. at 850 (citing *Burks* v. *Wis. Dep't of Transp.*, 464 F.3d 744, 450–51 (7th Cir. 2006)). If Perez is able to make this showing, the burden of production shifts to the Board to "offer a permissible, nondiscriminatory reason for the adverse employment action." *McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (citing *Fane* v. *Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007)). If the Board proffers this, the burden then shifts back to Perez "to show that the stated reason is merely a pretext for discrimination, i.e., a lie." *Id*. The Board argues that Perez has failed to establish the second and fourth elements of her prima facie case and has not rebutted the Board's proffered nondiscriminatory reason for her reassignment. Since Perez claims that she "performed satisfactorily and [her] employer is lying about the business expectations required for the position, the second prong and the pretext

---

[2] 42 U.S.C. § 1981 states, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

8

question seemingly merge because the issue is the same – whether the employer is lying." *Peirick* v. *IUPUI Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007) (citation omitted) (internal quotation marks omitted). Thus, the court will first address the fourth element of Perez's prima facie case.

### A. Similarly Situated Individuals

The Board claims that Perez has failed to show that similarly situated individuals at Gary School who were not in her protected class were treated more favorably. To demonstrate that other individuals are similarly situated, Perez must identify Gary School employees who are "directly comparable to her in all material respects." *Patterson* v. *Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Material respects depend on the employment context and may include "whether the employees 'dealt with the same supervisor[,]' . . . were 'subject to the same standards[,]' . . . [and] had comparable 'experience, education and qualifications,' provided that the employer took these factors into account when making the personnel decision in question." *Id.* (quoting *Radue* v. *Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)). Perez, who is of Mexican national origin, argues that Petri and Polenisiak, both Caucasians, were similarly situated to her at Gary School, given that they all reported to Juarez, held special education certifications, and indicated on their April/May 2008 teacher preference assignments that they wished to remain in their current non-special education positions. She maintains that the only difference motivating Juarez's decision to assign her to special education teacher was her ability to speak Spanish, which is directly tied to her national origin. The Board, however, disputes this and emphasizes other differences. For example, of the three employees, Perez was most familiar with the teaching approaches utilized in special education classes at Gary School

9

and had performance deficiencies in her current Case Manager/Counselor position that Petri, a computer teacher, and Polenisiak, a gifted math teacher, did not.

Since "distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions," identifying similarly situated employees is "not an unyielding, inflexible requirement that requires near one-to-one mapping." *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("It is important not to lose sight of the common-sense aspect of this inquiry."); *see also Filar* v. *Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("[A] plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces."). Thus, summary judgment would only be proper if "such distinctions are so significant that they render the comparison effectively useless." *Humphries*, 474 F.3d at 405 ("[R]ecall that the plaintiff need not *prove* anything at this stage."). The Board's cited differences do not make Perez's comparison effectively useless, as a reasonable jury could find that Petri and Polenisiak are similarly situated to Perez or, alternatively, that they are not. Thus, a genuine dispute exists with respect to this element.

## B. Board's Basis for its Decision

The Board next argues that Perez has failed to show both that her job performance met the Board's legitimate expectations and that the Board's proffered reason for her reassignment – her inadequate performance as Case Manager/Counselor – is a pretext for discrimination. Since both issues hinge on whether the Board is lying about the quality of Perez's job performance and its effect on Juarez's decision, the court will address the second element of Perez's prima facie case and the pretext question concurrently. *See Peirick*, 510 F.3d at 687.

Perez must still "show that the employer's stated reason for an employment action is dishonest and that the true reason was based on discriminatory intent." *McGowan*, 581 F.3d at 581; *see also Barricks* v. *Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) ("The focus of a pretext inquiry is whether the employer's reason is honest, not whether it is accurate or wise."). Thus, Perez must "present some circumstances from which intentional discrimination can be inferred." *McGowan*, 581 F.3d at 581. Since Perez lacks direct evidence that Juarez reassigned her because she is Mexican, she must use indirect evidence to show that Juarez's "stated reason is not credible and is factually baseless." *Id.* ("[A] plaintiff must do more than simply allege that an employer's stated reasons are inaccurate.").

There is no evidence indicating that Juarez's real motivation for reassigning Perez was discriminatory. Quite the contrary, there is abundant evidence supporting the Board's claim that Perez was reassigned due to her performance failures as Case Manager/Counselor. First, Perez failed to keep Gary School in compliance with IEP mandates, which was among her key responsibilities. In April 2008, a month before her reassignment, Juarez received written notice from OSS that Gary School was out of compliance with its IEPs, and that same month, Perez

11

admitted that she was aware of "concerns with compliance." Pl.'s Dep. 16:1–6. Although Juarez requested that Perez provide him with specific materials to respond to OSS, she failed to do so by the requested time. Further, Juarez and Polenisiak personally identified numerous errors on IEPs prepared by Perez, and Juarez and another staff member had to spend over a week contacting parents to correct these issues and obtain required approvals. Juarez also received complaints that teachers and parents were not invited to IEP meetings and had been instructed to sign IEP documents without being given appropriate explanations. Finally, in May 2008, the month of her reassignment, Perez still had many IEPs that remained out of compliance, since review meetings that were supposed to occur in late 2007 or early 2008 had not yet taken place.

In addition to issues with IEP compliance, Perez had other weaknesses as Case Manager/Counselor that could have reasonably motivated Juarez to reassign her. First, Perez had interpersonal communication problems with co-workers, evidenced by a "fall out" with two colleagues that Juarez appointed to assist her, DSF ¶ 29, and complaints from Gary School's former principal about her inability to get along with clinicians. Juarez had to counsel Perez about her job duties, time management, and communication, and called at least two meetings to discuss her communication problems and settle disputes she had with support staff.

Perez also struggled with time management and admittedly failed to complete "a lot" of her duties as a result. DSF ¶ 33. Perez worked past 4:00 p.m. on only three days from August 2007 through May 2008, and clocked out before 3:40 p.m. on all but one day in March 2008. Despite claiming that she took work home with her and had to leave early to carpool with her husband, the record indicates that Jacobson, Perez's replacement, was able to complete all assigned duties by working longer hours at school. Similarly, Perez ran into difficulties

12

managing the ISAT process but admittedly left the testing area early one day without approval, which resulted in testing being delayed for third and fifth graders, and arranged and attended a different meeting on the same day the school was scheduled for testing. The fact that ISAT administration ran more smoothly under Perez's replacement lends further credence to Juarez's proffered basis for reassigning her.

The only facts Perez sets forth to show that Juarez's stated reason is a pretext for discrimination are (1) that Juarez rated her performance "satisfactory" after observing her during two IEP meetings, even though she admits this captured only "a moment in time," DSF ¶¶ 22–23, and (2) that she was fluent in Spanish while the other two potential candidates for special education teacher were not. Although Juarez gave Perez a rating of "satisfactory" after observing her at these meetings, he also observed that one of the meetings was not well organized and that parents and staff did not seem to know what was going on. Further, Perez's evaluation sheet supports the Board's contention that Juarez rated her with some weaknesses and low strengths. Numerous check marks that Perez claims indicate "strengths" begin completely on the right side of the dash for "strength" and only fill in the space between "strength" and "weakness" instead of the space for "strength." These ratings are, at best, low strengths. Moreover, they do not indicate that the Board is factually baseless in claiming that Perez failed to meet its legitimate expectations, particularly given the faults cited above. Similarly, the fact that Juarez found Perez's ability to speak Spanish helpful for teachers at Gary School, where 99% of students are Hispanic, does not demonstrate that he had racial animus toward Perez as a Mexican or is lying about his real reason for reassigning her. *See Soberal-Perez* v. *Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class"

since the classification is made "on the basis of language, *i.e.,* English-speaking versus non-English-speaking individuals, and not on the basis of race . . . or national origin.").

Thus, the court has no reason to question the Board's credibility and finds no support for the inference that Juarez reassigned Perez because she is Mexican and not because she failed to meet the Board's legitimate expectations as Case Manager/Counselor. Since Perez has failed to establish critical components of her discrimination claim, summary judgment will be granted.

## II. Violation of Whistleblower Act

Perez also claims that she was retaliated against in violation of the Whistleblower Act when she was reassigned to special education teacher. Under the Whistleblower Act, "[a]n employer may not retaliate against an employee *for refusing to participate in an activity* that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20 (emphasis added). Perez claims that the Board retaliated against her in response to two emails she sent: one to Pederson at ISBE and another to Collins-Story, Director of the Citywide Services Office. Whether Perez's emails refer to activities that would violate the law need not be addressed, as her claim fails to cite any evidence showing that she refused to participate in these purportedly illegal activities. *See Robinson* v. *Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (plaintiff had no claim under Whistleblower Act after reporting that co-workers used drugs since there was "no indication that he refused to use drugs himself").

Perez's email to Pederson with the subject "ELL Modifications" asked him to clarify an apparent conflict between ISBE and CPS policies relating to which students could receive certain test accommodations. Pl.'s Ex. 7. It made no mention, however, of Perez's refusing to follow one policy or the other so as to avoid violating the law. Similarly, Perez's email to

14

Collins-Story with the subject "I need your help" explained that she did not have time to complete certain job responsibilities during ISAT testing and that her failure to do so could result in Gary School's not satisfying its legal obligations. Pl.'s Ex. 2. The email provides no evidence that Perez refused to complete these assignments and only suggests that she did not have time to do so. Thus, Perez has failed to establish that she refused to participate in an activity that would have violated the law. Accordingly, summary judgment will be granted.

## CONCLUSION AND ORDER

For the foregoing reasons, the Board's motion for summary judgment [#39] is granted. The case is terminated.

ENTER:

Dated: August 9, 2010

_____
JOAN HUMPREY LEFKOW
United States District Judge